IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

JOSHUA MATTHEW MACIEJEWSKI,

Plaintiff,

v.

OFC. JULIO GARCIA-CASH,
OFC. CONNER O'LEARY,

Defendants.

Case No. 6:25-cv-00509-MC

OPINION AND ORDER

MCSHANE, Judge:

Plaintiff Joshua Maciejewski brings this action against Defendants Officer Julia Garcia-Cash and Officer Conner O'Leary, asserting several § 1983 claims for unlawful search and seizure and excessive force. Am. Compl. 3–4, ECF No. 20. Defendants move for Summary Judgment. Defs.' Mot. Summ. J., ECF No. 29. Genuine disputes of material fact preclude summary judgment. Additionally, those disputed facts, viewed in the light most favorable to Plaintiff, mean that Defendants are not entitled to qualified immunity. Accordingly, Defendant's motion DENIED.

**BACKGROUND**

Defendants were assigned to a City of Springfield Police Department operation to prevent retail theft. Cash Decl. ¶ 4, ECF No. 29-1; O'Leary Decl. ¶ 4, ECF No. 29-2. In this task force, officers communicated with asset protection teams of several retail stores. On August 30, 2024, members of the Asset Protection Team of a Springfield Target store informed Defendants that Plaintiff exhibited behavior indicating that he could be engaging in theft-related activities. Cash

Decl. ¶ 7. Such behavior included picking items up and setting them down "so rapidly that it became hard for members of the team to keep track of the items that Plaintiff had actually put back," remaining in the store for "an unusually prolonged period of time," and exiting the store after abandoning a filled shopping basket. *Id.* Defendants recognized these behaviors as similar to those exhibited by people stealing from retail stores. Cash Decl. ¶ 10. Defendants also observed Plaintiff leave the store "without completing a purchase and passing through all points of sale," which Defendants recognized as consistent with one who is stealing from a retail store. Cash Decl. ¶ 1.

Defendants stopped Plaintiff outside the store to investigate whether Plaintiff had stolen anything. Cash Decl. ¶ 11. They identified themselves as Springfield Police Department officers, provided their names, and informed Plaintiff that their contact was being recorded. Cash Decl. ¶12; O'Leary Decl. ¶ 13. Defendant Cash inquired as to whether Plaintiff stole anything inside of Target and Plaintiff answered in the negative; explaining that because of his OCD, he could not decide what he wanted to buy. Dec. O'Leary Ex. 2; 1:18-1:40. Defendant O'Leary then questioned Plaintiff as to whether he smoked methamphetamine that day, or whether Plaintiff had stolen property on his person. Exhibit 2; 1:45-2:02. After stating that he had neither smoked methamphetamine nor stolen anything, Plaintiff offered to empty his pockets. Defendants informed Plaintiff that he needed to prove that he had not, in fact, stolen anything and asked for Plaintiff's identification. After Plaintiff (correctly) informed the Defendants that because he was not under arrest, he did not have to identify himself, Defendants immediately told Plaintiff to place his hands behind his back. Defendants handcuffed Plaintiff just under two minutes from their initial contact with Plaintiff.

The parties spent the next several minutes arguing about whether Plaintiff had to identify

2

himself. Again, Plaintiff correctly informed the officers that because he was not under arrest, he did not have to identify himself under Oregon law. At one point, Defendants informed Plaintiff that if he had driven through a stop sign without stopping, they could detain Plaintiff until Plaintiff identified himself. To which Plaintiff noted, "I haven't run a stop sign." Defendants then reached into Plaintiff's pocket and retrieved his wallet. Plaintiff informed the officers that they were violating his rights and that he did not consent to this search. As Defendants rifled through Plaintiff's wallet, they confirmed that they were looking for his identification. After O'Leary found Plaintiff's identification, he put Plaintiff's wallet back in Plaintiff's pocket, stating that he had found what he was looking for.

O'Leary Decl. Ex. 2; 2:03-6:38.

After finding Plaintiff's identification, O'Leary called in Plaintiff's name to dispatch. Upon learning that Plaintiff had outstanding warrants for his arrest, O'Leary placed Plaintiff under arrest. O'Leary Decl. ¶ 15. Upon searching Plaintiff pursuant to the arrest, Defendants did not find any Target merchandise on Plaintiff.

**LEGAL STANDARD**

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)).

3

**DISCUSSION**

Defendants argue that they are entitled to summary judgment because they (1) had reasonable suspicion to believe that Plaintiff was engaged in theft, (2) handcuffed Plaintiff "for officer safety and to maintain control of the situation," (3) were justified in searching Plaintiff in order to identify him, and (4) did not use excessive force in handcuffing Plaintiff. Defs.' Mot. 9–16. In the alternative, Defendants argue that they are entitled to qualify immunity. Defs'. Mot. 16.

**I. Section 1983 Claims**

Plaintiff brings his claims under 42 U.S.C. § 1983. Section 1983 claims require "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Benavidez v. Cnty. of S. D.*, 993 F.3d 1134, 1144 (9th Cir. 2021). Here, only the first element—whether Defendants violated Plaintiff's constitutional rights—is at issue.

**A. Reasonable Suspicion**

Plaintiff argues that the communications between Defendants and Target's Asset Protection Team, in addition to other reported observations, fail to provide reasonable suspicion that he engaged in theft. Pl.'s Resp. 6. The Court disagrees.

First, a seizure does not occur simply because a police officer approaches an individual and asks a few questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A consensual encounter with a police officer only ripens into a seizure when, under "all the circumstances surrounding the encounter," the "police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 439. Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may briefly detain an individual based on reasonable suspicion of criminal activity and take reasonable steps to investigate that suspicion.

4

Such a stop must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe*, 470 U.S. 675, 682 (1985). "The reasonable suspicion standard is not a particularly high threshold to reach." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

Here, Defendants received information regarding Plaintiff's behavior in Target—including staying in the store an unreasonably long time and "repeatedly picking up and putting down items"—from Target's Asset Protection Team. Cash Decl. ¶ 8.  This contemporaneous information, provided not by an anonymous source but with individuals known to, and working with, the officers, "lends significant support to the tip's reliability." *Navarette v. California*, 572 U.S. 393, 399 (2014). The asset protection team also sent Defendants pictures of Plaintiff. Cash Decl. ¶ 8. Additionally, Defendants observed Plaintiff put down a basket filled with items before exiting the store "without completing a purchase and passing through all points of sale." Cash Decl. ¶¶ 10–11. Defendants presented evidence that such behavior is consistent with individuals attempting to steal from a retail store. Cash Decl. ¶ 10

Plaintiff submits no evidence in response, arguing only that the messages between Target employees and Defendants were not submitted as evidence. Pl.'s Resp. 5. Each officer, however, submitted a declaration, signed under threat of perjury, that they received the above information from Target's Asset Protection Team before stopping Plaintiff outside the store. Cash Decl. ¶ 8; O'Leary Decl. ¶ 8. This information, supported by both the officers' own observations and their training and experience regarding retail store theft, provided the Defendants with reasonable suspicion to conduct an investigatory *Terry* stop to determine whether Plaintiff had committed the crime of theft. *Arvizu*, 534 U.S. at 273–74 (although an officer's "hunch" of criminal activity does not justify a stop, officers may rely on their training and experience to support inferences of

5

criminal activity). That Defendants ultimately determined that Plaintiff had not, in fact stolen from Target does not somehow extinguish their reasonable suspicion at the time of the stop. Likewise, that there could be perfectly innocent reasons for Plaintiff's behavior does not deprive the officers of reasonable suspicion to believe Plaintiff was engaged in theft. *Navarette*, 572 U.S. at 403.

### B. Unlawful Search & Seizure

Plaintiff raises two arguments regarding unlawful seizure: (1) that any investigatory stop turned into a *de facto* arrest when Defendants handcuffed Plaintiff, and (2) that Defendants' search of Plaintiff's wallet was an unlawful search.

### a. *De Facto Arrest*

The totality of the circumstances determines whether and when a mere investigatory stop becomes an arrest. *See Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir.1996) (noting each case is fact-specific because there "is no bright-line rule to determine when an investigatory stop becomes an arrest"). In looking at the totality of the circumstances, the Ninth Circuit examines "two main components of the detention." *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014). First, courts consider the intrusiveness of the officer's methods, judged by whether a reasonable person would have felt the ability to leave after answering a few questions. *Edwards*, 761 F.3d at 981. Next, courts consider "the justification for the use of such tactics," that is, whether reasonable law enforcement officer would have "had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* (quoting *Lambert*, 98 F.3d at 1185).

Here, Plaintiff's liberty was not meaningfully restricted until he was handcuffed. Generally, although handcuffing "substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop," the relevant inquiry remains one of reasonableness under the circumstances. *United States v. Bautista*, 684 F.2d 1286, 1289

6

(9th Cir.1982); *but see Lambert*, 98 F.3d at 1186 ("because we consider both the inherent danger of the situation and the intrusiveness of the police action, . . . pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not *automatically* convert an investigatory stop into an arrest that requires probable cause"). In the Ninth Circuit, "the use of especially intrusive means," such as handcuffs, are only allowed "in special circumstances" before turning a *Terry* stop into an arrest. *Lambert*, 98 F.3d at 1189.

Here, there is—at the very least—a genuine dispute of material fact whether legitimate officer safety concerns justified Defendants' decision to handcuff Plaintiff. There is no indication that Plaintiff was a flight risk. The suspected crime of shoplifting from Target is not a violent crime. Defendants had little reason to believe that Plaintiff was armed. These are all factors to be considered in judging the reasonableness of an officer's decision to handcuff a suspect during a *Terry* stop. *Id.* The encounter occurred not in a dark alley, but in a well-lit area in front of a busy retail store. The officers were not outnumbered and, despite disagreeing with Defendants' recitations of Oregon law, a reasonable jury could find that Plaintiff posed no threat to Defendants.

Additionally, the declarations provided by Cash and O'Leary indicate that Defendants handcuffed Plaintiff simply because they wanted to identify him (and not for any specific threat of harm). Cash Decl. ¶ 14 ("Plaintiff refused to identify himself despite attempting to explain to him the basis for our reasonable suspicion and need for his identity and as a result, Plaintiff was placed in handcuffs to assist in our investigation."); O'Leary Decl. ¶ 14 (same). Finally, the recording of the encounter depicts a brief discussion where Defendants immediately handcuffed Plaintiff after Plaintiff stated that he did not have to show Defendants his identification. Again, there is a question over whether Defendants had any legitimate reason for handcuffing Plaintiff that would justify the use of handcuffs in this situation.

7

*b. Unlawful Search*

Because Defendants do not—and could not—argue that they had probable cause to arrest Plaintiff for the crime of theft, Defendants' search of Plaintiff's wallet was unlawful. This is so because Oregon has no "stop and identify" law when officers only have reasonable suspicion.

Within the *Terry* framework, the Supreme Court of the United States has recognized that an officer's request for identification does not, by itself, constitute a seizure under the Fourth Amendment. *Immigr. Naturalization Serv. v. Delgado*, 466 U.S. 210, 216 (1984). In fact, when an officer has reasonable suspicion sufficient to justify a *Terry* stop, the officer may ask questions and take additional steps reasonably related to the investigation. *Id*. That said, "the Fourth Amendment itself cannot require a suspect to answer questions." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 187 (2004); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (noting that although an officer may ask a suspect questions regarding his identity during a *Terry* stop, the suspect "is not obliged to respond."); *see also Terry*, 392 U.S. at 34 (White, J., concurring) (noting that during *Terry* stop, suspect may be asked questions but "is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest"); *see also Kolender v. Lawson*, 461 U.S. 352, 365 (1983) (Brennan, J., concurring) (*Terry* stops are limited and "most importantly, the suspect must be free to leave after a short time and to decline to answer the questions put to him").

Although the Fourth Amendment does not allow an officer to require a suspect to identify oneself, state law may require a suspect to identify themself during a valid *Terry* stop (because such a request is reasonably related to the stop's purpose, rationale, and practical demands). *Hiibel*, 542 U.S. at 187–88 (2004); Thus, any legal obligation to compel a suspect to identify oneself arises from state law, not the Fourth Amendment itself. *Id.*

8

While many states have "stop and identify laws" permitting an officer to require a suspect to disclose their identity under penalty of arrest, Oregon has no general "stop and identify" statute. In Oregon, the duty to identify oneself (absent probable cause) generally arises only in the context of traffic violations. However, Oregon declines to impose any stop and identify obligation for those who, like Plaintiff, were not driving a vehicle.

ORS § 131.615 specifically outlines what conduct is permissible under a *Terry* stop in Oregon. Pursuant to ORS § 131.615(1), the officer may stop the suspect and "make a reasonable inquiry" for "a reasonable time." Oregon's law is analogous to *Terry*, limiting the stop to the "immediate circumstances that aroused the officer's suspicion," things the officer learns during the initial questioning, and any issues related to the safety of the officer or the public. *Id.* Conspicuously absent from the statute is anything requiring a suspect to identify themself.

Although nothing prevents law enforcement officers from asking for identification, Oregon law does not allow law enforcement to perform a search during a *Terry* stop unless the officer has reasonable suspicion to believe the suspect is carrying a weapon. ORS § 131.625. Audio and video of the encounter, along with the transcript, indicates that Defendants specifically sought out Plaintiff's wallet not because they believed it was a weapon, but because they wanted Plaintiff's identification card. For example, after handcuffing Plaintiff, the parties continued arguing over whether Plaintiff had to identify himself. But Cash then starts looking for Plaintiff's identification and Plaintiff says "hang on. I don't give you consent to search." Tr. Ex. 3, 12; ECF No. 29-3. And Cash replied, "That's fine. I'm looking for your identity." Tr. 12. Plaintiff protested, "You don't need my identity. So, listen, this is illegal. . . . I'm voicing this now. This is an illegal search of my person." Tr. 12–13. In a concise summary of the applicable law, Plaintiff then informs the Defendants: "you have the right to remove anything that may be subject as a weapon or that you

9

may feel is a weapon." Tr. 15. After Plaintiff again (correctly) warns O'Leary that O'Leary does not have the right to remove his wallet, O'Leary reaches into Plaintiff's pocket, removes the wallet and states, "That's fine. Do you have an ID in here? There we go. I'm going to put this back in your pocket, because I found what I'm looking for." Tr. 15. O'Leary then immediately relayed Plaintiff's name to dispatch. It appears that Defendants removed Plaintiff's wallet not because they viewed it as a potential weapon, but because they wanted to identify Plaintiff. Defendants do not present any evidence, or even attempt to argue, otherwise.

Neither ORS § 131.615, nor § 131.625 permits law enforcement to require a suspect to identify themselves or produce identification. Rather, the only Oregon statute that allows an officer to do so absent probable cause is ORS § 810.410, which states that a police officer "may stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, *identification* and issuance of citation."[1] ORS § 810.410(3)(b) (emphasis added). Here, Plaintiff was not stopped pursuant to a traffic violation under ORS § 810.410, but for suspicion of theft under ORS § 131.655. Accordingly, Defendants were not permitted to require Plaintiff to identify himself or produce identification. Additionally, as demonstrated above, there is evidence indicating that Defendants searched Plaintiff's wallet not for any legitimate safety concern, but for the sole purpose of identifying Plaintiff. Neither the Fourth Amendment nor any Oregon law would authorized such a search.

### C. Excessive Force

"The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007). "Determining whether the force used to affect

---

[1] In fact, as noted above, O'Leary explained that if Plaintiff had run a stop sign, O'Leary could detain Plaintiff until O'Leary identified Plaintiff. Tr. 10. To which Plaintiff responded, "I haven't run a stop sign." Tr. 10.

10

a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). When evaluating the government's interest in using force, the Court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Ultimately, the issue is whether the totality of the circumstances justified the force used. *Id.*

Under most *valid* seizures, such a minimal use of force (like handcuffing) would not rise to the level of a constitutional violation. *See Williamson v. City of Nat'l City*, 23 F.4th 1146, 1152 (9th Cir. 2022) ("'yanking, pulling, jerking, and twisting' a person whose legs are pinned underneath a car seat" or lifting someone constitutes only a 'minimal' use of force, even where the arrestee suffered injuries because of the force). There is no indication, at all, that the officers acted with any intent to apply wanton or gratuitous levels of force. They did not yank Plaintiff's limbs, push him down, or aggressively wrestle him to the floor. In fact, even after being handcuffed, the Parties continued to converse for several minutes without Plaintiff mentioning that he was in pain or even uncomfortable in the slightest degree. However, there is an argument to be made that if the search was not lawful, and if there was no threat to officer safety, then any amount of force could be unreasonable. Therefore, Defendants are not entitled to summary judgment on Plaintiff's excessive force claim.

## II. Qualified Immunity

In the alternative, Defendants argue that even assuming that they violated any of Plaintiff's Constitutional rights, they are entitled to qualified immunity. Defs.' Mot. 16.

11

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Garza v. City of Salem*, 690 F. Supp. 3d 1188, 1203 (D. Or. 2023). In resolving questions of qualified immunity at the summary judgment stage, a court must undertake an individualized, two-pronged inquiry. *See Cunningham v. Gates*, 229 F.3d 1271, 1282 (9th Cir. 2000). The first prong asks whether the facts, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right. *See Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). The second prong asks whether the right in question was "clearly established" at the time of the violation. *Id.* at 656.

As demonstrated above, police officers around the country have been on fair notice, for decades, that nothing in the Fourth Amendment requires a suspect to identify themselves during a *Terry* stop. *Hiibel*, 542 U.S. at 187; *Berkemer*, 468 U.S. at 439; *Terry*, 392 U.S. at 34 (White, J., concurring); *Kolender*, 461 U.S. at 365 (1983) (Brennan, J., concurring). Additionally, police officers are expected to know of, and abide by, state laws. Therefore, any Oregon police officer should know that (1) Oregon has no general "stop and identify" law and (2) ORS 131.615, which outlines actions allowed during a *Terry* stop in Oregon, does not allow an officer to search for a suspect's identification absent probable cause.

Regarding the handcuffing of Plaintiff, there is a genuine dispute regarding whether Defendants had any legitimate safety concern for handcuffing Plaintiff. If they lacked such concerns, many cases, for decades, provided Defendants fair warning that the Fourth Amendment prohibits "especially intrusive means" (i.e., using handcuffs) to physically restrict Plaintiff's liberty. *Lambert*, 98 F.3d at 1188–89. Additionally, there is a genuine dispute regarding whether any use of force here, however minimal, was reasonable under these circumstances.

12

## **CONCLUSION**

Defendants' Motion for Summary Judgment, ECF No. 29, is DENIED.

IT IS SO ORDERED.

DATED this 12th day of May 2026.

_s/Michael J. McShane_____

Michael McShane
United States District Judge
